**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LIANA M., by and through her legal guardians, | : | |
| William Mitchell K. and Michele K., | : | |
| of Downingtown, Pennsylvania | : | Civil Action |
| Plaintiffs | : | |
| v. | : | 2:23-cv-1101 |
| | : | |
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | |
| 540 Trestle Place, | : | |
| Downingtown, Pennsylvania 19335 | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

## I.    Introduction

1.     This action is brought by Liana M., a minor child with disabilities, and her grandparents and legal guardians William Mitchel K. and Michele K. (collectively, "Plaintiffs" or the "Family"), against Defendant Downingtown Area School District ("School District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; the federal and state implementing-regulations of the foregoing statutes; and Chapters 14 and 15 of the Pennsylvania Code.

2.     This action concerns the School District's denial of public funding for an Independent Educational Evaluation ("IEE") for Liana pursuant to IDEA, as well as an action to recover prevailing party attorney's fees under IDEA.

3.     Liana lives in a happy, safe, and loving home with William Mitchell K. ("Mitch") and Michele K. ("Grandparents"). But before her Grandparents won custody of Liana, Liana's life was chaotic and traumatic. When she was three years old, her father (Mitch K.'s son) died in a one-car, drug induced car accident. Her mother, a prolific drug user and dealer, attempted to raise

her two young children, but Liana and her brother suffered tremendously living with their biological mother.

4.      In 2017, and then again in 2019, Liana was diagnosed with Post-Traumatic Stress Disorder ("PTSD"). While the School District was aware of the PTSD diagnosis and Liana's traumatic upbringing, when the School District hired an independent contractor to evaluate her for special education, it withheld this information from the evaluator.

5.      Consequently, in March of 2021, the evaluator did not comprehensively evaluate Liana for special education, including, but not limited to, performing a psychiatric evaluation and thoroughly exploring the effect of the PTSD diagnosis on Liana's education.

6.      In July of 2022, the Family disagreed with the School District's March 2021 Evaluation Report and requested an IEE, which the School District refused to fund. Consequently, the School District filed a special education due process complaint on August 29, 2022, to defend the March 2021 Evaluation Report. A due process hearing was held on November 14, 2022. On December 29, 2022, the Hearing Officer, Brian Jason Ford, Esquire, issued a Final Decision and Order ("Decision") finding in part for the School District and in part for the Family.

7.      The Hearing Officer ordered that based on the School District's knowledge of the PTSD diagnosis, the District was mandated to collect additional information concerning whether the diagnosis was interfering with Liana's education so as to determine whether a reevaluation of Liana was appropriate. Because the Hearing Officer's Decision forced the School District to take action it otherwise was not inclined to take, the Family secured a judgment on the merits thereby conferring upon the Family prevailing party status and entitling them to attorney's fees and costs under IDEA.

8.      Oddly, the Hearing Officer did not decide the critical issue in the case, namely, the

approximate time period that the School District become aware of the PTSD diagnosis: "I decline to resolve [the] conflict" of "[w]hen the Guardians shared the Student's PTSD diagnosis with the District[,]" because the conflict "is not outcome determinative." Decision, 10-11. This is an error of law, as the issue is certainly outcome determinative: without a determination of when the Family told the District about the PTSD diagnosis, the Hearing Officer was unable to determine whether the evaluation was comprehensive, and, thus, appropriate.

9.      In addition, the Hearing Officer found in-part for the School District, by erroneously concluding that the Family did not disagree with the evaluation report. Decision, 13. This is an error of both law and fact. It is an error of law because the School District conceded this argument in its written closing argument; yet, the Hearing Officer raised it sua sponte. In addition, the Hearing Officer's conclusion is legal error because he is requiring the magic words of "I disagree" to trigger the IEE request.

10.     The finding the Family did not disagree with the evaluation is an error of fact because the Family's case was premised on the belief that the School District failed to evaluate Liana in all suspected areas of need, namely, with respect to her mental health and emotional needs. If the Family did not disagree with the 2021 Evaluation Report, then it would not have asked for an IEE. The Hearing Officer's conclusion is so counterintuitive that it borders on the absurd and must be reversed.

11.     After fully considering the entire record, the Plaintiffs respectfully request that this Court hear additional evidence to make a determination as to when the Grandparents told the School District about the PTSD diagnosis; affirm the Hearing Officer's order requiring the School District to collect further data to determine whether a reevaluation is warranted; determine that the School District violated the foregoing statutes; reverse the Hearing Officer's decision denying the

IEE; and award reasonable attorneys' fees and costs and any other relief this Court deems just.

## II.   <u>Parties</u>

12.    Liana at all relevant times resided in Downingtown, Pennsylvania with her Grandparents, Mitch and Michelle K., and within the geographical boundaries of the Defendant School District.

13.    Liana is not currently identified a student with a disability under IDEA.

14.    While the School District has refused to provide Liana with a Section 504 Plan, her PTSD diagnosis qualifies her for as a Protected Handicapped Student under Section 504 and the ADA; however, she is not currently identified under Section 504.

15.    The District is located at 540 Trestle Place Downingtown, Pennsylvania 19335. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities.

## III.   <u>Procedural History</u>

16.    On July 15, 2022, the Guardians requested an Independent Educational Evaluation ("IEE") in order to comprehensively evaluate all of Liana's needs because the District's March 22, 2021 Evaluation Report ("2021 Evaluation Report") failed to sufficiently and comprehensively evaluate her complete educational needs.

17.    The Family agreed to give the School District a reasonable opportunity to investigate the request for an IEE and did not object to any perceived delay in the District's filing

for due process.

18.     On August 29, 2022, the School District filed a Special Education Due Process complaint against the Family to defend the 2021 Evaluation Report.

19.     Following an evidentiary hearing held on November 14, 2022, an administrative Hearing Officer issued a written decision on December 29, 2022, finding in-part of the Family and in-part for the School District..

20.     The Family now appeals the Hearing Officer Decision to this Court.

## IV.     **Jurisdiction and Venue**

21.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

22.     Plaintiffs have exhausted their administrative remedies where required under IDEA (20 U.S.C. § 1415(i)), having timely pursued a Special Education Due Process hearing.

23.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

24.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391.

## V.     **Standard of Review**

25.     This Court is required to undertake a fully independent review of the record and the hearing officer's decision. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

26.     In conducting this independent review, district courts: (i) shall receive the records

of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

27.     The Third Circuit requires "a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA" called modified de novo review. *Mary T. v. School District of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009).

28.     Under modified de novo review, district courts shall accord "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id*. at 269-70.

## VI.     <u>Applicable Law</u>

### A.     **IDEA requires that a school district identify all children with disabilities who live in the district and conduct a special education evaluation.**

29.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

30.     The IDEA establishes requirements for evaluations. *See* 20 U.S.C. § 1414. "Each local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability." *Id*. at § 1414(b)(3)(B). In addition, "[e]ach local educational agency shall ensure that . . . assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided." *Id*. at § 1414(b)(3)(C).

31.     Evaluations must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining" whether the child is a child with a disability and, if so, what must be provided through the child's IEP for the child to receive FAPE. *Id*. at § 1414(b)(2)(A).

32.     During evaluations, a school district must use a variety of assessment strategies to gather relevant information about the child, and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

33.     The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

34.     After a child is determined to be eligible, IDEA and its regulations provide for periodic reevaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every three years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(i), (ii); *see also* 34 C.F.R. § 300.303(b).

35.     School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

**B.     Where a school district's evaluation report fails to comprehensively evaluate a child in all areas of suspected need, a parent is entitled to an Independent Educational Evaluation at public expense.**

36.     An evaluation must go beyond basic assessing academic needs because FAPE extends beyond discrete academic skills, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

37.     The plain language of IDEA provides that the onus to comprehensively evaluate a child is not on the individual evaluator, but on the School District: "*[e]ach local educational agency* shall ensure that . . . the child is assessed in all areas of suspected disability". 20 U.S.C. § 1414(b)(3)(B) (emphasis supplied).

38.     A parent has an "unqualified right" to obtain an IEE at public expense if the evaluation is not comprehensive. *Warren G. v. Cumberland County School District*, 190 F.3d 80, 87 (3d Cir. 1999); 34 C.F.R. § 300.352(b)(1). In *Warren G.*, the Third Circuit reversed a hearing officer's determination that school district's evaluation was inappropriate, holding that the district's evaluation report failed to uncover the student's "specific problem areas." *Id*.

39.     Where a school district refuses to fund an IEE, the district must file for due process and prove that its evaluation was appropriate. 34 C.F.R. § 300.352(b)(2).

**C.     This Court may hear additional evidence at the request of a party.**

40.     The IDEA explicitly provides for a federal district court to accept additional evidence when the Court or one or both parties establishes a need for it, in order for the Court to make a proper determination of the matter before it:

In any action brought under this paragraph, the court-

(i) shall receive the records of the administrative proceedings;

(ii) *shall hear additional evidence at the request of a party*; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C) (emphasis supplied).

41.     The Third Circuit construed this provision in *Susan N. v. Wilson School Dist.*, 70 F.3d 751 (3d Cir. 1995), holding that "the question of what additional evidence to admit in an IDEA judicial review proceeding, as well as the question of weight due to the administrative findings of fact, should be left to the discretion of the trial court." 70 F.3d at 760; *see also Carlisle Area School Dist. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995); *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1990).

42.     "The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.'" *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 791-92 (1st Cir. 1984) (emphasis added), *aff'd on other grounds*, 471 U.S. 359 (1985).

   **D.     A parent is considered the prevailing party and entitled to attorney's fees where it secures an administrative decision on the merits forcing a school district to take action and that achieves some benefit from bringing the suit.**

43.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

44.     A "prevailing party" is a party that succeeds on any significant issue in litigation which achieves some of the benefit sought in bringing suit. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983). The Supreme Court has held that a party is considered the

prevailing party if it secures an administrative or judicially sanctioned result on the merits, such as a final order or a court-ordered consent decree. *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Services*, 532 U.S. 598, 600-02, 121 S.Ct. 1835, 1838-39 (2001)).

45.     The Third Circuit has articulated a two-prong test to determine if a party was a prevailing party: first, "whether plaintiffs achieved relief," and second, "whether there is a causal connection between the litigation and the relief from the defendant." *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 131 (3d Cir. 1991); *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 271 (3d Cir. 2002).

46.     Finally, a plaintiff need not succeed on every issue in the litigation to be considered the prevailing party; rather, so long as the plaintiff prevails on an issue that shares a common core of facts with an issue on which he did not prevail, then a court should not reduce his attorney's fees for any perceived lack of success. *See Mancini v. Northampton County*, 836 F.3d 308, 321 (3d Cir. 2016) (awarding nearly 100% of fees despite prevailing on only one of 15 claims and receiving only five percent of damages requested, as the case involved common core facts and plaintiff prevailed on one crucial issue).

## VII.   <u>Factual History</u>

47.     Plaintiffs incorporate by reference the preceding paragraphs.

48.     Mitch K. ("Grandfather"), Liana's biological grandfather, obtained full custody of Liana and her brother in 2017 following the death of his son (Liana's father) in 2016.

49.     Liana's father died in a one-car, drug-induced car accident. Her mother was a drug addict, drug dealer, and was intermittently incarcerated.

50.     Liana suffered tremendously living with her biological parents.

51.     Drug addicts and drug dealers regularly came and went from their house, sometimes armed with firearms, and sometimes breaking into their house threatening or fighting with their mother. The children would huddle under a bed together for safety. There was barely any food in the house. Her brother (Wesley, a kindergartener at the time) was tasked with preparing food and feeding Liana. It was traumatic, and while Michelle K. ("Grandmother") describes Liana as a "survivor" and a "strong kid," she testified that Liana continues to worry about her grandfather, afraid that she may lose him too.

52.     Liana knows her mother is alive, but also that she cannot live with her; this causes Liana anxiety, stress, sleep walking, and nightmares.

53.     The guidance counselor (Jennifer Addy) knew of Liana before she started kindergarten, as the Grandmother informed Ms. Addy about the trauma Liana and her brother endured.

54.     Ms. Addy and the Grandmother spoke multiple times per year every school year via email, phone, and in person. Ms. Addy knew that Liana's father died in a drug-related car accident, that her mother was incarcerated, and that the Grandparents had full custody of Liana and her brother.

55.     Thus, as soon as Liana started kindergarten (2017-2018 school year), Ms. Addy made a point to "get eyes on her a little bit more intentionally" and began counseling sessions with Liana in a group called "Confident Kinders." However, Ms. Addy did not share this information with Ms. Lustman.

56.     Ms. Addy provided this counseling in kindergarten because of the trauma Liana experienced in her short life.

57.     Ms. Addy recommended to the Grandmother that Liana receive outside therapy to

help her process the trauma caused by losing her parents. However, Ms. Addy did not share this information with Ms. Lustman.

58.    In September of 2017 (kindergarten), Holcomb Behavioral Health Systems ("Holcomb") diagnosed Liana with PTSD.

59.    While the Grandmother agreed that she did not physically hand the Holcomb Evaluation to a School District employee, she verbally told Ms. Addy that Liana was diagnosed with PTSD. However, Ms. Addy did not share this information with Ms. Lustman.

60.    In January of 2018, just a few months after Liana was diagnosed with PTSD, the Grandmother signed a release for Ms. Addy to speak with Holcomb.

61.    Ms. Addy agreed that she spoke with the Grandmother about Liana's outside therapy at Holcomb, provided records to Holcomb, and spoke to Liana's therapist at Holcomb to coordinate services. However, Ms. Addy did not share this information with Ms. Lustman.

62.    Ms. Addy was aware of Liana's PTSD diagnosis and she communicated with Liana's outside service providers.

63.    The Grandmother discussed Liana's anxiety with the guidance counselor "many times." They spoke "a lot," perhaps once per month from kindergarten through third grade.

64.    The Grandmother related Liana's background to each of Liana's teachers, her guidance counsel, and the school principal.

65.    Liana's counseling continued into first grade (2018-2019) when Ms. Addy enrolled her in a grief counseling group. This grief counseling was co-facilitated with an outside provider (a bereavement center). However, Ms. Addy did not share this information with Ms. Lustman.

66.    In addition to her in-District counseling, in first and second grade, Liana attended weekly counseling sessions outside of school to help her process her trauma and cope with her

anxiety.

67.     Holcomb diagnosed her with PTSD again in September of 2019 (second grade).

68.     In second grade, the Grandmother told Ms. Addy that Liana was receiving therapy through not just Holcomb but also a private therapist (Dr. Holly Copeland). However, Ms. Addy did not share this information with Ms. Lustman.

69.      In December of 2019 (second grade), the Grandmother also signed a release for Ms. Addy to share records with Dr. Copeland. However, Ms. Addy did not share this information with Ms. Lustman.

70.     Ms. Addy testified that she received a release for records from Dr. Copeland. However, Ms. Addy did not share this information with Ms. Lustman.

71.     Ms. Addy stated that she understood that she (Ms. Addy) was to be communicating with Dr. Copeland, but because the release was "blank" she did not communicate with Liana's therapist.

72.     Because of the COVID-19 pandemic, Liana did not attend counseling outside of school in third grade (2020-2021 school year).

73.     However, in school, Liana participated in counseling in the third grade.

74.     In third grade, Ms. Addy transitioned Liana into two separate counseling groups: an executive functioning group and the Grit and Growth counseling, which is the counseling that was reflected on Liana's (Educational Student Assistance Plan ("ESAP")).

75.     The Grit and Growth counseling was essentially teaching children coping skills.

76.     Liana also struggled throughout her education with executive functioning needs.

77.     In the beginning of the third grade (2020-2021 school year) her third grade teacher (Ms. Vogel) observed that Liana struggled completing her work, lacked focus, was easily

distracted, was disorganized, and had trouble paying attention, particularly with Zoom lessons.

78.    Liana also struggled to attend school, amassing 16 absences in the third grade, which Ms. Vogel stated was "a lot" of academic time to miss. The Grandmother reiterated to Ms. Vogel that Liana was struggling to complete her work at home, was easily distracted, lacked motivation, and needed frequent breaks to complete tasks.

79.    The Grandmother testified that Liana's PTSD manifests itself by Liana experiencing anxiety and executive functioning needs, specifically involving focus and attention.

80.    Ms. Addy recommended Liana attend an executive functioning counseling group two times per week, but Liana did not participate in it due to the fact it was scheduled during the time Liana was eating breakfast at school.

81.    Liana's third grade teacher, Ms. Vogel, understood that Liana was experiencing stress at home and that this stress prevented Liana from completing her work.

82.    Ms. Vogel and the Grandmother would communicate frequently (at least weekly), over both email and Zoom.

83.    Ms. Vogel knew that Liana had a "troubled past" and was a "sensitive student;" Ms. Vogel needed to pay close attention to "her emotional concerns if or when they came up in the classroom;" had to approach Liana "gently;" and could not be an authoritative teacher with Liana. Ms. Vogel knew that because of Liana's past, she needed to approach her "more intentional[ly]" so that Ms. Vogel could provide her with emotional support and "be on her team."

84.    Ms. Vogel knew that Liana experienced "stressful times at home with [respect to] . . . work completion."

85.    Ms. Vogel knew that Liana was meeting with the guidance counselor (Ms. Addy) in third grade for a group that provides support for children suffering grief and loss.

86.     Ms. Addy discussed with Ms. Vogel that Liana was working on building her resiliency and motivation to help improve her task completion.

87.     When asked if Ms. Vogel "ever [had] a discussion with the grandparents concerning mental health needs," Ms. Vogel responded that "I knew that she was meeting with Mrs. Addy, and I was copied on e-mails that came from [Ms. Addy] to the parents. So I was aware of it."

88.     The school nurse (Lisa Montemuro) was also aware that Liana was experiencing anxiety and that the anxiety may manifest itself in physiological issues, such as stomachaches. However, Ms. Montemuro did not share this information with Ms. Lustman.

89.     The school nurse was aware that Liana's father had died, her mother was incarcerated, and Liana was being raised by her grandparents.

90.     Ms. Montemuro testified candidly and stated that the Grandmother told her that Liana had emotional and mental health needs. However, Ms. Montemuro did not share this information with Ms. Lustman.

91.     Ms. Montemuro testified that the Grandmother told her that Liana may come to visit her (the school nurse) not because she has any physical ailments, but because it is "related to her being sad about her parents."

92.     She added that the Grandmother told her that Liana "might say that she has a stomachache, but it would be because she's worried about . . . her family or something in her life."

93.     The Grandmother testified that Liana would frequently (about once per week) complain of a stomachache even though she has no physiological issues with her stomach. The Grandmother believes this is related to stress.

94.     Ms. Montemuro stated that if Liana was displaying emotional or mental health needs, she would have had a conversation with Ms. Addy and would have asked Liana to schedule

a time to speak with Ms. Addy.

95.     In approximately October of 2020 (third grade), the Grandparents requested a special education evaluation.

96.     The School District denied that request.

97.     Instead, the School District implemented the ESAP. The ESAP included goals for reading comprehension and task competition.

98.     However, after implementing the ESAP for two months, Liana's teachers determined that Liana's executive functioning needs, namely her work completion and distractibility, were not improving.

99.     The School District added a one-on-one aide to help Liana to organize and complete her tasks.

100.    In January of 2021, Liana continued to struggle in school and thus the Grandparents asked again for the School District to evaluate Liana.

101.    Ms. Vogel testified that because Liana was not progressing using the ESAP, the School District was unable to deny the evaluation request for a second time.

102.    More specifically, Ms. Vogel noted executive functioning concerns, such as distractibility and an inability to complete her work.

103.    The School District hired an independent contractor (Ms. Lustman) to evaluate Liana.

104.    No one from the School District informed Ms. Lustman that Liana had PTSD.

105.    No one from the School District informed Ms. Lustman that Liana was receiving services from Holcomb or Dr. Copeland.

106.    No one from the School District informed Ms. Lustman that Liana had received, in

one form or another, counseling services in-school from kindergarten through fourth grade.

107.    Ms. Lustman was not a School District employee, and she only knew Liana from the evaluation she performed of Liana.

108.    Ms. Lustman had only a superficial understanding of Liana's upbringing. She knew that Liana's father had passed away and that her mother had a history of drug addiction, but none of Liana's teachers elaborated on Liana's past trauma.

109.    Ms. Vogel failed to discuss with the evaluator that Liana attended grief counseling with Ms. Addy.

110.    In fact, Ms. Vogel failed to have any conversation with Ms. Lustman about Liana and only provided brief written input to the evaluator.

111.    Despite being aware of emotional needs, neither Ms. Addy nor Ms. Vogel disclosed those needs to the Ms. Lustman.

112.    When Ms. Lustman spoke with the Grandmother, she told Ms. Lustman that she (the Grandmother) had concerns about Liana's emotional health.

113.    Ms. Lustman emailed Ms. Addy for information concerning Liana's emotional needs, but Ms. Addy did not respond to Ms. Lustman's email.

114.    The only information Ms. Lustman received concerning Liana's counseling was that based on the ESAP, which gave Ms. Lustman the impression that Liana only had counseling in the third grade and that it ended.

115.    Ms. Lustman claimed to have reviewed Liana's records but did not see releases for Dr. Copeland or Holcomb in the records.

116.    Ms. Lustman admitted that had she known of the PTSD diagnosis and therapies she "absolutely" would have requested records from the service providers to determine whether

Liana's mental health needs were impacting her education.

117.    Ms. Lustman admitted that had she known Liana was diagnosed with PTSD, she would have followed up with Ms. Addy, the Grandparents, and Liana's teachers to further evaluate Liana's emotional needs.

118.    Ms. Lustman admitted that had she known Liana was receiving services from Holcomb, she would have investigated to determine whether there were "any behavioral characteristics consistent with PTSD that were happening at the school that [she] might have missed."

119.    However, she was unable to conduct this investigation because Ms. Addy did not disclose that Liana was receiving outside therapies and did not disclose that Liana was diagnosed with PTSD.

120.    Ms. Lustman added that had she known Liana was receiving outside therapies, she would have included that in her evaluation "[b]ecause it would be a nice addition to understanding Liana as a learner and all the areas that she has strengths and areas of need in."

121.    Asked if Ms. Lustman would have requested records from any outside therapies, had she known Liana was receiving said therapies, Ms. Lustman replied: "absolutely."

122.    The 2021 Evaluation Report did not find Liana eligible for special education services under either IDEA or Section 504.

123.    Consequently, the School District chose to simply continue using the ESAP, which was previously not working and which led to the School District's January 2021 decision agreeing to the Grandparents' request for an evaluation.

124.    In his Decision, the Due Process Hearing, the Hearing Officer found that Ms. Lustman would have taken additional action had she known of the PTSD diagnosis. Decision, 15.

125.     The Hearing Officer, then ordered the District to take such action, including: "ask[ing] the Guardians 1) if the Student is in any type of therapy for PTSD, and 2) what concerning behaviors, if any, the Student exhibits at home." Decision, 15.

126.     The Hearing Officer also ordered the District to "solicit information from the Student's teachers and the school nurse consistent with the [Ms. Lustman]'s testimony [concerning the actions she would have taken had she known of the PTSD diagnosis.]" Decision, 15.

127.     On January 10, 2023, the School District requested additional information concerning Liana's PTSD diagnosis.

128.     The Grandparents were slow to respond and on January 26, 2023, the School District decided not to offer Liana a re-evaluation.

129.     On or about February 17, 2023, the Grandparents provided additional information concerning Liana's PTSD diagnosis and the emotional and executive functioning needs that result from that diagnosis.

130.     As the evidence demonstrated at the Due Process Hearing, the Family contends that the School District has been aware of Liana's PTSD diagnosis and the needs associated with that diagnosis for many years. The District denies that claim.

131.     However, it is undisputed that the District has been aware of the PTSD diagnosis since August of 2022, as that is when counsel provided documentation of the PTSD diagnosis to counsel for the School District.

132.     Upon receipt of that diagnosis in August of 2022, the School District took no action until the Hearing Officer's decision forced the School District to take action in January of 2023 to collect information to determine whether Liana requires a reevaluation under IDEA or Section 504.

133.     Unfortunately, to date, the School District continues to refuse to reevaluate Liana.

134.     To date, the School District refuses to find her eligible for services under IDEA or Section 504.

## VIII.   **The Hearing Officer's Errors**

135.     The Plaintiff incorporates by reference the preceding paragraphs.

136.     The School District unquestionably failed in its statutory duties to Liana and the Hearing Officer erred in ruling otherwise and in failing to award the Family an IEE at public expense.

137.     The 2021 Evaluation Report was not appropriate because the School District failed to comprehensively evaluate Liana in all areas of suspected need.

138.     The 2021 Evaluation Report was not comprehensive because no School District employee provided a complete picture of Liana to the evaluator.

139.     The Grandparents made the School District aware of Liana's history of trauma, PTSD diagnosis, outside therapies, and anxiety, but none of this critical information is in the 2021 Evaluation Report.

140.     The Hearing Officer made a fundamental error of law by "declin[ing] to resolve [the] conflict" of "[w]hen the Guardians shared the Student's PTSD diagnosis with the District[,]" claiming that the conflict "is not outcome determinative." Decision, 10-11. This is an error of law, as the issue is certainly outcome determinative: without a determination of when the Family told the District about the PTSD diagnosis, the Hearing Officer is unable to determine whether the evaluation was comprehensive, and, thus, appropriate.

141.     The Hearing Officer erred by expressly refusing to decide whether the Family told the School District about Liana's PTSD diagnosis before the competition of the 2021 Evaluation

Report. The Plaintiffs respectfully request that the Court hear live evidence on that significant issue so as to determine that critical matter.

142.    To the extent that the Hearing Officer found that the School District was unaware of Liana's PTSD diagnosis before the completion of the 2021 Evaluation Report, that finding is contradicted by the Grandmother's testimony and by the Decision itself, as the Hearing Officer also found:

- "On December 4, 2019, the Guardians signed a release for the District to share information with a therapist who was working with the Student at that time. The Guardians left the form mostly blank, providing no information other than the therapist's name (the Guardians did not say who the person was, or what information could or could not be shared)." Decision, 3 (*citing* exh. S-8).

- "During 1st and 2nd grade, the Guardians and the Student's teacher and guidance counselor were in frequent communication. Regardless of whether the Guardians gave the private evaluation to the District, the District's professional employees understood that the Student had a traumatic past and was receiving outside therapy." Decision, 4 (*citing passim*).

- "In January 2021, the Guardians again asked the District to evaluate the Student to determine eligibility for special education. The Guardians were particularly concerned that the Student might have an emotional disability." Decision, 6 (*citing* exh. S-6).

143.    The Hearing Officer erred by concluding that the Family did not disagree with the evaluation report. Decision, 13.

144.    The Hearing officer referred to disagreeing with the evaluation as a "threshold" issue; however, this is an error of law, as there is no such requirement in the IDEA.

145.    The Hearing Officer's determination that the Family did not "disagree" with the evaluation report was the basis of his denial of the request for an IEE and any other analysis in his Decision is dicta.

146.    The Hearing Officer erred as a matter of law by raising the "disagreement" issue

sua sponte, as the School District conceded in its written closing argument that the Family disagreed with the 2021 Evaluation Report. School District's Closing Argument, 13.

147.    The Hearing Officer's conclusion is legal error, as he is requiring the magic words of "I disagree" to trigger the IEE request.

148.    In addition, the Hearing Officer's determination is also an error of fact, as the Family absolutely disagreed with the Evaluation Report.

149.    The entire premise of the Family's case was that the School District failed to evaluate Liana in all suspected areas of need, namely, with respect to her mental health and emotional needs. If the Family did not disagree with the evaluation report, then it would not have asked for an IEE. The Hearing Officer's determination is so counterintuitive that it borders on the absurd and must be reversed.

150.    Because the Grandmother testified that she provided the PTSD diagnosis to the School District and that she suspected Liana had emotional needs and wanted the School District to evaluate said needs, the Hearing Officer's finding that she did not disagree with the evaluation report is not supported by the record.

151.    The Hearing Officer erred by concluding the evaluation was appropriate, as the evaluator did not comprehensively evaluate Liana for special education, including, but not limited to, performing a psychiatric evaluation and thoroughly exploring the effect of the PTSD diagnosis on Liana's emotional health

152.    The School District erroneously failed to identify Liana as eligible for services under IDEA or Section 504.

153.    The Family completed all necessary paperwork and signed the necessary releases for the School District to evaluate Liana and obtain records from outside providers, namely her

private therapist (Dr. Copeland) and Holcomb Behavioral Health Services.

154.    The Family made Liana available for testing.

155.    The Family is entitled to an IEE at public expense.

156.    The District's failure to offer Liana a non-discriminatory, appropriate educational environment resulted in her being excluded from participation in, denied the benefits of, or subject to discrimination in, her education in violation of not only IDEA, but Section 504 and the ADA as well.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this action;

2.    Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) on the issue of when the School District became aware of Liana's PTSD diagnosis.

3.    Reverse the Hearing Officer's Decision and award the Family an IEE at public expense;

4.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

5.    Independent of whether the Court awards an IEE, declare Plaintiffs were the prevailing party at the below Due Process Hearing and award reasonable attorneys' fees and related costs because the Hearing Officer's Decision forced the School District to take action it otherwise was not inclined to take and there was no voluntary change in the School District's behavior;

6.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA; and Pennsylvania law; and

7.    Grant such other relief as this Court deems proper.

Respectfully submitted,

/s/*D. Daniel Woody*
D. Daniel Woody, Esquire
Pennsylvania ID No. 309121

Woody Law Offices, P.C.
110 W. Front Steet
Media, Pennsylvania 19063
O: (610) 566-8770
C: (610) 453-4460
d.daniel.woody@gmail.com
Counsel for Plaintiffs